Filed 8/25/25  P. v. Butts CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ASHLEY MELISSA BUTTS,<br><br>    Defendant and Appellant. | B336561<br><br>(Los Angeles County<br>Super. Ct. No. BA447486) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mildred Escobedo, Judge.  Affirmed.

Kravis, Graham & Zucker, Thomas Ian Graham and Randy S. Kravis for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

# INTRODUCTION

After a series of personal and housing-related disputes, defendant Ashley Melissa Butts conspired with her friend Israel "Stoney" Rios to assault her landlord, a man named Larry D.[1] The conspiracy involved Butts paying and otherwise helping the perpetrators, who discharged a gun and repeatedly hit Larry with a blunt object during the assault, resulting in him suffering a concussion and other injuries. A jury found Butts guilty of felony assault and conspiracy to commit the assault, and the trial court sentenced her to four years in prison.

Butts asks us to reverse her conviction. She challenges several of the trial court's evidentiary rulings (including the admission of evidence she claims the court should have suppressed under the exclusionary rule), seeks review of the court's ruling on her motion for discovery of peace officer personnel records, contends the court failed to sua sponte instruct on the lesser included offense of simple battery, and asks us to remand for the trial court to reconsider its denial of her motion for mental health diversion.

Other than one evidentiary ruling on a hearsay-related impeachment issue, we conclude the trial court did not err. As for that isolated evidentiary ruling, the court's error was

---

[1] Larry D.'s proper first name is Lawrence, but he is referred to as "Larry" throughout the record, so we identify him by that name. We initially refer to Larry D. by his first name and last initial pursuant to the guidance of California Rules of Court, rule 8.90(b)(4), and thereafter by his first name only for ease of reference. No disrespect is intended.

harmless because the evidence of Butts's guilt was overwhelming. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Although the facts of this case are not particularly complex, it has generated a record of Brobdingnagian proportions. We summarize only those portions of the facts and proceedings necessary to discuss the issues raised on appeal.

### A. The People Charge Butts with Assault, Conspiracy, and Burglary

On June 14, 2016, the People filed a felony complaint charging Butts and Rios with assaulting Larry by means likely to cause great bodily injury (Pen. Code,[2] § 245, subd. (a)(4); count 1), conspiracy (§ 182, subd. (a)(1); count 2) with the underlying crime identified as the alleged assault, and first degree residential burglary (§ 459; count 3). In April 2017, after Butts and Rios were held to answer, the People filed an information charging them with the same crimes.

On January 11, 2019, the trial court granted Butts's motion to sever her case from Rios's case.

### B. Butts Pleads Guilty, Withdraws her Plea, and the Initial Trial Results in a Mistrial

On September 12, 2019, the court granted Butts's motion to dismiss the burglary count, and she pleaded guilty to the assault and conspiracy counts. On November 13, 2019, Butts filed a motion to withdraw her guilty plea, which the trial court granted.

---

[2] Unspecified statutory references are to the Penal Code.

3

Butts's case went to trial in February and March 2022, with Butts representing herself.[3] On March 15, 2021, the trial court declared a mistrial after the jury could not unanimously agree as to either count.

## C.    The People Retry Butts

On January 10, 2023, the People filed an amended information charging Butts with assault by means likely to cause great bodily injury (§ 245, subd. (a)(4); count 1) and conspiracy (§ 182, subd. (a)(1); count 2), and alleging an enhancement as to both counts that a principal was armed with a firearm (§ 12022, subd. (a)(1)).

The case went to trial in July 2023 with Butts represented by counsel.[4] The evidence at trial showed the following. All the events relevant to the assault and the ensuing investigation occurred in 2016, so to avoid repetition we refrain from continuing to repeat the year when dating those events.

---

[3] Butts was initially granted leave to represent herself on March 29, 2021, after being represented by a series of retained and appointed counsel. On August 4, 2021, Butts substituted in private counsel, but three weeks later made another request to represent herself, which the trial court granted.

[4] The trial court revoked Butts's pro per status on January 3, 2023. Butts then retained counsel, who were permitted to withdraw after a little more than two months. Butts later substituted in a different retained counsel.

1. *Prosecution Case*

    a.     Larry's Testimony

        i.       *Butts becomes a tenant in Larry's house and the two have a series of disputes.*

Larry was divorced and lived in a three-bedroom house he owned. He agreed to rent the back bedroom to his friend Cordell. Cordell told Larry he was going to share the room and split the rent with a friend of his, who turned out to be Butts. Larry agreed.

Larry's house had two entrances, one in back and one in front. Both entrances had an interior wooden door and an exterior screen door. Larry understood that Cordell and Butts would primarily use the back entrance, which was near the bedroom they were renting. Larry met Butts at the house on February 17 or 18 and gave her a key which worked on both screen doors; Larry assumed that the rear wooden door would remain unlocked. There was only one key for the front wooden door, which Larry kept for himself. Larry would keep the front door locked when he was at home and generally left the key in the lock. The front wooden door also had a deadbolt operated by a knob.

When Larry initially met with Butts, he told her the move-in date would be March 1, and she told him she had one dog. On February 20, Larry awoke to find Butts already in the house, sleeping in the wrong bedroom, and that she had brought three dogs with her. Larry was allowing his friend Nate to keep a dog in the backyard, and Nate's dog had already been at the home for about a week. Larry told Butts that he did not want her dogs in the backyard with Nate's dog, so she would have to keep her dogs in the hallway outside of the back bedroom.

Soon after Butts moved in, she and Larry had disputes over several issues, including Butts's dogs, surveillance cameras Butts installed without permission, Butts taking Larry's deceased mother's clothes, Butts's use of the front door, and Butts's bicycles.

First, without asking permission, Butts placed a gate in the backyard so that she could keep her dogs there separated from Nate's dog. One of Butts's dogs got past the gate and was injured in a fight with Nate's dog. Butts took her dog to the veterinarian and later asked both Larry and Nate to pay the substantial veterinarian bill. Larry refused because he had told Butts to leave her dogs inside.

Second, Larry noticed that Butts had installed an outdoor surveillance camera which was connected to a wire that ran through Larry's bedroom. Larry told Butts to remove the camera. When Butts did not comply within about two days, Larry removed the camera himself. There was also a surveillance camera installed outside of the back bathroom, which Larry did not notice until later. Larry asked Butts to remove that camera, but she did not.

Butts noticed that Larry had some of his deceased mother's clothes in the house and expressed interest in them. Larry said he could sell the clothes to Butts and would come up with a price. Before the two agreed on a price and without Larry's permission, Butts started wearing some of the clothes and took others to be cleaned. Larry asked Butts to return the clothes. She returned some a day or so later; she told Larry he could get others from her car.

Butts sometimes left through the front door and left both the screen door and the interior wooden door unlocked. Butts

claimed she forgot to lock the doors.  Larry told Butts to use the back door and started locking the front wooden door whenever he was in the house.  About a week and a half later, at the end of March, Larry was unable to put his key into the lock on the front wooden door, and he discovered glue in the lock.  He confronted Butts in a text message, but she denied responsibility.  Larry was able to get the glue out and use the lock again.

In early April, Larry decided to ask Butts to move out.  He did not say anything to Butts or Cordell at that time, but did say something to Nate, who was close friends with Cordell.  Butts had earlier texted Larry about him evicting her, and Larry responded that he would evict her if she did not follow the rules.

Larry saw that Butts was storing her bicycles on the side of the house, in the neighbor's yard.  He asked her to move them to the backyard because he was concerned they would attract the attention of thieves.  Butts instead moved the bikes to the front yard, and Larry again told her to move them to the backyard.  After a few days, Butts moved the bikes not to the backyard but to the other side of the house.

ii.      *Butts's bikes are taken, Butts accuses Larry, and Larry is assaulted.*

On April 29, Butts's bikes went missing and Butts accused Larry and Nate of being involved in taking them.  Larry was not involved and told Butts that.  At 9:46 p.m., Butts texted Larry, "you were too soft to evict me or whatever so you try to do something really horrible to me to make sure that [I] would leave on my own."  After an exchange of texts, Larry texted at 10:14 p.m., "FOR THE LAST FUCKING TIME, [N]ATE NOR I [*sic*] HAD ANYTHING TO DO WITH YOUR BIKE BEING TAKEN. POINT BLANK."  Butts responded with two texts reiterating her

7

accusation, and Larry then texted, at 10:19 p.m., "You know what stop texting me. I told you we had nothing to do with it," and "End of story." Larry called Cordell to talk about the situation with Butts, and the conversation made him feel things with Butts were going to get "weirder." He then texted his ex-wife to say that if anything happened to him she should remember Butts's name.

Later, in the early morning hours of April 30, Butts asked Larry for a massage, something they had both done for one another in the past.[5] Larry agreed, hoping that Butts would apologize and they could move on from the missing bike situation. Butts was quiet and texted during the massage, which was unusual. After two to five minutes, Butts left the room saying she had to turn off her car lights. Larry saw Butts walk towards the front door and heard the front door open.

When Butts returned, Larry noticed loud music playing in Butts's room. When he asked her about it, she said it was to keep her dogs calm. Larry resumed the massage, and Butts resumed texting. Larry then heard the front door open again. When he asked about the noise Butts responded, "Do you think it's the dogs?" Larry thought that was a strange thing to say because the sound came from the front of the house whereas the dogs were in

---

[5] Larry and Butts were both into fitness and would give each other massages. The massages were not sexual in nature, except that during one massage in early April Larry kissed Butts on her shoulder. He then apologized and told her he would stop if she wanted him to. Butts grabbed Larry's hand and placed it on her breast, and then about three minutes later she abruptly got up and walked out. Larry texted Butts, apologized, and said it would never happen again.

back.  Larry got up to go to the front door and noticed Butts move to the far side of the room, away from the door, which he thought was weird.  As Larry got near the front door, he saw a person dressed in black, wearing a black skull mask, pointing a gun at him.  Larry said, "What the fuck is going on?" and the person responded, "You know what fucking time it is."  Larry could tell from the person's voice he was a male.

Larry was hit with something hard on his forehead, then twice on his arm as he tried to shield himself.  Larry backed away, and then he heard the gun go off and saw smoke.  Larry looked to see if he had been struck by the bullet; when he looked up he heard the front door open, and the man was gone.  Larry came to believe a second person was involved and recalled seeing a shadow of a second intruder during the assault.

Larry immediately accused Butts of being involved in the assault.  Larry asked Butts to call 911 and started calling family and friends for help.  Paramedics arrived, and Larry saw Butts showing them gunpowder burn residue on a door sill.  Butts was also trying to wipe off the residue; the paramedics told her to stop.  Larry was taken to the hospital and received six stitches to close a laceration on his forehead.  He also suffered a concussion.

b.      Evidence of the Gunshot and the Lack of Forced Entry

Los Angeles Police Department (LAPD) Officer Matthew Clark examined Larry's house about two hours after the assault and saw what appeared to be a powder burn on a door frame to the hallway.  The powder burn looked smeared and Clark opined that someone had tried to wipe it off.  Clark also recovered a bullet from the wall next to the door frame.  Clark inspected the front door for signs of forced entry and found none.

9

c.     Data from Butts's HTC Cell Phone

Alexander Supall, from the LAPD technical investigation division, testified that in 2016 a now-retired LAPD employee performed a logical download of an HTC phone which other evidence showed belonged to Butts.  A logical download produces a report showing the data on the phone, but not any deleted or hidden files.  Supall recalled that the logical download showed messages were missing in the latter part of March into April 2016.

Supall's unit later performed a "chip off" procedure on the phone, in which the phone's memory chip is removed.  Data is downloaded directly from the chip, and software then decodes the data.  The report generated from this process recovered texts to and from someone named "Stoney" from March 17 through 29, and on April 30 beginning at 10:11 a.m., and showed that all of these texts had been deleted from the phone.  Other evidence showed that "Stoney" was Rios's nickname.

Supall testified it was possible that messages from March 30 through April 30 had been deleted but did not show up on the report because a chip off procedure will not recover deleted data which has been overwritten.  On cross-examination, Supall explained that the report did not indicate when any data had been deleted, only that it had been deleted.  He also confirmed he did not know if the phone was in use during April 2016 prior to the assault.

d.     Butts Arranges for Rios to Go to Larry's House by Uber Just Before the Assault

Retired Federal Bureau of Investigation agent Chad Fitzgerald testified that he reviewed a report from Sprint for a phone number which other evidence showed belonged to Rios.

Fitzgerald analyzed the Sprint records to determine that in the early morning on April 30 the phone using that number traveled from Rios's house in Long Beach to Larry's house, leaving after 1:16 a.m. and arriving by 1:45 a.m. Fitzgerald also analyzed records provided by Uber to show that there was an Uber ride on April 30 which left the area of Rios's home at 1:21 a.m. and ended in the area of Larry's house at 1:52 a.m. The phone returned to Rios's home after the time of the assault, leaving at around 2:26 a.m. and arriving at or before 3:31 a.m.

Former Uber driver Raul Muniz testified that at 1:11 a.m. on April 30 he received a ride request for a pickup at Rios's address and a drop-off at Larry's address. Muniz also received a message through the Uber app from the Uber accountholder (who was Butts) indicating there would be three passengers and providing a phone number for one of the passengers; the number provided belonged to Rios. Muniz picked up only two men, whom he described as being Hispanic and bald. One of the men said he had cancer and one of the two had a cane. Although the original ride request indicated the destination was Larry's address, one of the passengers told Muniz to stop at an intersection near the address. The passengers got out there, and Muniz saw them walk towards Larry's house.

   e.  Butts's First Statements to the Police

LAPD Officer Eric Elenes testified about two interviews he conducted of Butts shortly after Larry was assaulted. In the first interview, Butts said that at about 2:05 a.m., while she was getting a massage from Larry inside his bedroom, she and Larry heard a loud bang coming from the front door area, and Larry went to investigate. Butts heard Larry say "Wait, wait," and saw a male wearing a long-sleeved black shirt with a black and white

11

bandanna concealing his face.  She saw the intruder strike Larry with a three-foot long metallic object, heard a loud pop, and then saw the intruder flee the house on foot.  After speaking with Larry, Elenes spoke with Butts a second time and asked whether she had left Larry's room during the massage.  Butts stated that she had left to take her dog out into the front yard.

f.      LAPD Detective Gregory Stearns

LAPD Detective Gregory Stearns and his partner, Detective Dan Myers, interviewed Butts in the early afternoon on April 30.  During the interview, Stearns became concerned that Butts was deleting evidence relevant to the investigation because he saw her manipulating her phone.  Stearns and Myers seized the phone, which was an HTC Desire model, and Stearns later delivered it to the LAPD technical investigation division to conduct a forensic examination.

After interviewing Butts, Stearns went to Larry's house.  At the house, he noticed that the powder burn appeared to have been smeared.

g.      Butts's Text Messages With Rios

The prosecution introduced reports, provided by Butts's cell phone carrier, Verizon Wireless, showing text messages and calls Butts initiated and received during April 2016.  In connection with analyzing these text messages, Stearns identified several phone numbers associated with Rios.

The Verizon Wireless records showed that Butts had engaged in the following exchanges with Rios.  On April 11, at 6:38 p.m., Rios asked Butts if she "ha[d] any more surveillance cameras," and Butts responded at 8:12 p.m., "Yes but I definitely need them with these fools."  About 30 minutes later, Rios texted, "Ya...the homie said he's down to touch that fool up for a

12

HUNNIT $," "HUNNIT means $100," and "Ur white, so just in case u didn't know." Butts responded within about a minute, "Hey" and "Hey yeah."

On April 29, at 10:57 p.m., about 38 minutes after Larry had asked Butts to stop texting him about the disappearance of her bikes, Butts texted Rios, "$200," and then "$250 cash. Right now." Rios responded at 11:07 p.m., "It's not that easy...hold [o]n," and then at 11:18 p.m., "the homie went looking for him, right now." At 1:10 a.m. on April 30, Rios texted his address; this was about a minute before Uber driver Muniz received the request through Butts's account for a ride from Rios's address to Larry's address.

At 1:26 a.m., Rios texted Butts, "Park ur Car on 78th pl.. Leave the car keys only, with the $," and "right now do that please." About four minutes later, Butts texted "Kk" and "On it." At 1:56 a.m., Rios texted, "Here," and about four minutes later, "How We get In," and Butts responded, "Knock." At 2:02 a.m., Rios texted, "Open it. ..homie will pre[t]en[d] he opened it with a knife."[6] At 2:03 a.m., Rios texted, "Open it..now We waiting." At 2:09 a.m., Butts texted, "Open," and Rios responded at 2:14 a.m., "There he goes." The prosecution later introduced evidence that Butts called 911 to report the assault on Larry at 2:16 a.m.

Later in the morning on the day of the assault, at 8:10 a.m., Butts texted Rios that she would be in Long Beach. Rios responded at 9:59 a.m., "Sorry just woke up," and asked if he could go to the grocery store. Butts texted, "Yes fine I had an

_____

[6] Rios's text stated, "homie will prevent he opened it with a knife" but in a following text he clarified he meant "pretend" instead of "prevent."

13

insane night just meet me at [L]ong [B]each in an hour or so," to which Rios responded, "Yes..[talk to you later] about it lol.. My homie said u a down ass bitch.. You are a bad bitch bby. Is a compliment." Butts texted, "What does that mean?? . . . I had such a crazy night I have to tell u, dude someone got in and tried to rob us and then we'll [*sic*] it's too much to text but I just got jumped right now, so I don't feel like it ...I'll call later," and Rios responded, "That means you got me and my homies respect..you earn - it." Butts texted, "Oh you mean cuz I let u borrow the car? It's no problem I told u when u loan me that 6bills for tigers surgery" and then "Stop!!" Rios then texted, "Put it this way you earned your stripes…G-code," and Butts responded "Stop," "Stop please," and "Hear me."

    h.  Items Found at Rios's Home

LAPD Officer Joel Ruiz testified that he searched Rios's house with his partner. They found a 17-inch metal flashlight and a 15-inch cylindrical metal pipe.

    2.  *Defense Case*

    a.  Butts's Testimony

Butts testified that she moved into Larry's house "sometime around" March 1. She shared a room with Cordell, and their relationship became romantic. When she moved in, Butts was working during the days and attending law school during the evenings.

Nate brought his pit bull Gator to stay at Larry's house after Butts started living there. Gator was aggressive and was chained up. At Larry's request, Butts kept her dogs inside, in the hallway which led to the back door, and would commonly use the back door to take the dogs outside. In the middle of April, Cordell called Butts at work to tell her that he had let her dogs out and

her dog named Tiger had been injured.  Butts took Tiger to the veterinarian and paid $1,300, using money she borrowed from Rios and some other friends.  If Butts had to blame anyone for the incident, it would be Cordell, who let Tiger out.  Butts spoke to Larry or Nate about having Nate contribute to the cost of the veterinarian's services because Nate's dog caused the injuries.

Butts installed two security cameras.  One had to be in Larry's room because that was where the router was located and Butts wanted the camera to cover the driveway.  Butts installed the security cameras so she could see if her dogs got out.  Butts installed the camera in Larry's room while he was in Las Vegas.  Larry took the camera in his room out about a week or two after Butts put it in.

Butts had known Rios for almost two years.  Rios had cancer, walked with a cane, had trouble driving, and was often in pain.  Butts bought marijuana from Rios three times a month.  Butts also saw Larry buy marijuana from Rios four times.

When she received Rios's April 11 texts—"the homie said he's down to touch that fool up for a HUNNIT $," "HUNNIT means $100," and "Ur white, so just in case u didn't know"— Butts did not know what the texts were about.  She responded, "Hey" in response to the text about her being "white" because she understood it to be an insult.  She responded "Hey yeah" to the text "HUNNIT means $100" because she knew what the word meant.  Butts did not recall having any conflict with Larry at that time or telling Rios she had any conflict with Larry.  Butts denied putting glue in the lock of the front door or having a disagreement with Larry about the front door.

Butts often coordinated with Rios about purchasing marijuana through texts.  She sometimes left her car unlocked so

that Rios could drop off marijuana. If Rios was dropping marijuana off at Larry's home and Butts was not there, it was not unusual for Rios to give it to Larry.

On April 28, Butts's car keys, house key, and bike lock key went missing. Larry returned the keys on April 29. Someone informed Butts the keys had been given to Nate by mistake. The next day, April 29, Butts's bikes went missing, including one she had bought from Rios. Butts still owed Rios $650 for the bike. Butts accused Larry of either having stolen the bikes or having someone else steal them. When Butts texted "$200" and then "$250 cash. Right now" at 10:57 p.m. the night of the assault, Butts was referring to how much she was going to pay Rios for both marijuana and the bike.

Butts admitted messaging the Uber driver on April 30 at 1:16 a.m. Butts sometimes let Rios borrow her car and would arrange for Rios to come to Larry's house to pick up the car. Butts had offered to loan Rios her car on April 29 so that he could visit his daughter and his mother's gravesite.

Butts was waiting for Rios to bring marijuana, and when Butts texted "Knock" to Rios at 2:01 a.m., she anticipated that Rios would knock at the back door.

In the early morning hours of April 30, Butts asked Larry for a massage. Although she felt betrayed because she believed Larry was involved in the disappearance of her bikes, she "wanted to work things out and talk to him about it." While Larry was giving her the massage, Butts heard a loud noise and suggested it might be a dog scratching at the kitchen door. She denied having any music on at that time. Larry went to investigate the noise. Butts heard Larry scream, so she left the bedroom and saw a man with a bandanna across his face holding

16

a gun with a sock over his hand. The man appeared to have dark skin. Larry stepped forward and got his hands on the gun. As Larry and the intruder struggled over the gun, Larry was struck in the head with the butt of the gun and the gun went off. The intruder then ran out of the house. Larry immediately blamed Butts for the assault.

Butts denied setting up Larry to be beaten, and stated, "I would never be upset enough to harm anyone."

In the late morning after the assault, when Rios complimented her by text, Butts responded "Stop!!" and "I don't feel like it" because she was too tired to text.

Butts had activated her HTC phone after the assault. Prior to that phone, Butts had been using a Motorola Droid Mini phone which she acquired in March 2016. Butts told Stearns about the Motorola phone but did not give it to him. Butts had a habit of deleting Rios's texts because they involved marijuana sales.

b.     The Cross-examination of Butts

Butts authenticated a recording of her call to 911 just after the incident. Butts told the 911 operator that she thought the noise was just a dog, and that she heard a slap, but did not tell the operator that she saw a gun.

Butts also authenticated a tape of her statement to Officer Elenes and his partner. Butts told the officers she was not sure whether the intruder had a gun and said she did not see a gun. Butts told the officers she was with a friend, "Stoney," earlier; she claimed she did not know Stoney's last name. Butts admitted she was talking about Rios but claimed she did not remember Rios's real name at the time. Butts told the officers she had known Stoney for five years. Butts told the officers she went

17

outside during the massage, and when she came back inside she locked the door.

When she was interviewed on April 30 by Stearns and Myers, she told them she had a friend, "Stoney," whose true name was Brandon. Butts told the detectives that she went to meet up with Brandon in the evening on April 29 after she got home from buying a new bike at Target. She gave Brandon her car, and Brandon later called her and asked about the interior lights in her car.

### c. Redirect Examination of Butts

Butts explained that at the time of the incident she did not know Rios's real name, she met Rios through a person named Brandon, and she was hesitant to give the detectives information about Rios because she was buying marijuana from him. If Butts was "fiddling with" her phone as one of the detectives stated, it was because she "like[d] to do things with [her] hands in stress situations." If Butts went outside during the April 30 massage, she would not have gone out the front door and would have used the back door instead. She could have locked the front door because it had a handle-operated lock. Only Larry had the key to the other lock.

## D. The Verdict and Sentencing

On July 17, 2023, the jury found Butts guilty on both counts and found the principal-armed enhancement allegation true.

On January 25, 2024, the trial court sentenced Butts to the mid-term of three years on the assault, plus one year for the firearm use enhancement, for a total sentence of four years. The court stayed the sentence for the conspiracy count. Butts timely appealed.

## DISCUSSION

Butts does not challenge the sufficiency of the evidence against her. She claims the trial court made four erroneous evidentiary rulings, seeks our independent review of the trial court's ruling on her motion for discovery of Stearns's and Myers's personnel records, contends the trial court erred in failing to sua sponte instruct the jury on simple assault as a lesser included offense, and asks us to conditionally reverse her conviction and direct the trial court to determine whether she should be granted mental health diversion.

### A.   The Trial Court Did Not Err in Denying Butts's Motion to Suppress Evidence Obtained from the Warrantless Searches of her Cell Phone

Prior to trial, Butts moved to suppress evidence obtained through two warrantless searches: Myers looking at her HTC phone during the April 30 interview to see whether any texts or calls had occurred around the time of the assault, and the LAPD's logical download of data from that same phone. Butts claimed she did not consent to these searches, and they were therefore improper.[7] The trial court denied the motion to suppress.

---

[7] Butts's appellate briefing erroneously asserts that the chip off extraction of data from the HTC phone's memory chip was performed before Stearns obtained a search warrant. In fact, that search was performed pursuant to a warrant which Butts does not challenge on appeal. Furthermore, the search of the memory chip was not the subject of Butts's motion to suppress. Butts did move to traverse the warrant which led to the chip off extraction of data, arguing that the affidavit requesting the warrant improperly included evidence from the allegedly non-

On appeal, Butts contends the trial court could only have upheld the warrantless searches if she consented to them, and the trial court erred because it made no express finding that she in fact did consent.  The People contend we should imply a finding of consent.

1.     *Legal Principles and Standard of Review*

"Our review of issues related to the suppression of evidence seized by the police is governed by federal constitutional standards." (*People v. Lenart* (2004) 32 Cal.4th 1107, 1118; see Cal. Const., art. I, § 28, subd. (f)(2).)  " '[T]he ultimate touchstone of the Fourth Amendment is "reasonableness." ' [Citation.]  Our cases have determined that '[w]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant.' [Citation.]  . . .  In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." (*Riley v. California* (2014) 573 U.S. 373, 382 [134 S.Ct. 2473, 189 L.Ed.2d 430].)  "It is 'well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent.' " (*People v. Woods* (1999) 21 Cal.4th 668, 674, quoting *Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 219 [93 S.Ct. 2041, 36 L.Ed.2d 854].)

"[T]he prosecution bears the burden of demonstrating a legal justification for [a warrantless] search.  [Citation.]  'The

consensual warrantless searches at issue in this appeal.  The trial court denied the motion to traverse.  As Butts does not appeal the denial of the motion to traverse, we do not discuss it further.

standard of appellate review of a trial court's ruling on a motion to suppress is well established.  We defer to the trial court's factual findings, express or implied, where supported by substantial evidence.  In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment.' " (*People v. Redd* (2010) 48 Cal.4th 691, 719.)

    2.    *Factual Background*

        a.    The April 30 Interview and the Initial Search of Butts's HTC Phone

Stearns recorded a portion of the interview he and Myers conducted of Butts on April 30.  The recording indicates Myers asked to see Butts's cell phone to look at her text messages from "around 3:00" because Larry claimed that Butts was texting just before the assault.  Butts equivocated about what she had been doing on her phone during the massage, and began to look through her phone, purportedly to find out whether she had been texting then.  After a passage of time, Myers noted that Butts had been "fiddling with [her] phone now for the better part of four minutes," and asked if she had found any texts.  Butts stated that she could not find any, and Myers asked, "would you mind if I took a look?"  Butts responded, "I would not mind at all."  Myers looked and stated that there were no text messages from April 30.

Butts then told the detectives that she had been using a different phone prior to 3:00 a.m. that morning, which she believed was in her car; she claimed the phone she had been using "died" while she was on a call with 911 and she was unable to "revive" it.  Myers then stated, "maybe we can start with that phone," referring to the phone Butts had been using prior to

21

3:00 a.m. that morning, and Butts responded, "Yes. Absolutely." The detectives stepped away and agreed that they needed to obtain Butts's phones because Butts might have deleted data from them.

The detectives returned to Butts and indicated they wanted to take her phones. Butts then called her father, and the group spoke. Myers stated he felt he could legally seize the phones, and a judge would thereafter authorize searching them, but he hoped that Butts would consent. After speaking privately with her father, Butts indicated she would require the detectives to obtain a warrant. Stearns then stated he was going to seize the phones for safekeeping. Butts asked, "So you're taking them right now, is what you're saying?" Stearns responded, "Yeah." The detectives then had a discussion with Butts's father to explain why they felt they needed to seize the phones, and Butts's father told her not to turn over her phone. At that point, the recording stops.

According to Stearns, after the recording stopped, Butts signed a consent form authorizing the search of her two phones. Stearns delivered the HTC phone to the LAPD technical investigation division, which did a preliminary examination of the phone (the logical download) and reported that there was a complete lack of data from April 4 to 30, 2016.

b. Stearns Obtains a Warrant to Further Search the HTC Phone, and Subpoenas Verizon Wireless

Stearns testified that Butts had consented to a search on her phone for activity during the first eight hours of April 30. When Stearns learned about the lack of data on the HTC phone, he decided "[he] needed to expand the search of the phone beyond

22

the consent that was initially provided by . . . Butts, at which point the examination of the phone stopped until a search warrant was obtained."

On May 2, Stearns sought and obtained a warrant authorizing a broader search of the HTC phone to include its memory cards.  Stearns also obtained authorization to subpoena records from various wireless carriers for records associated with Butts's cell phone number.  Stearns served a subpoena on Verizon Wireless, which later provided a report of the activity from Butts's cell phone account.  As summarized previously, at trial the prosecution presented the results from the chip off extraction from the phone's memory card and a report from Verizon Wireless showing the content of text messages.  Butts does not contend that the trial court erred in admitting the content of any text messages.

3.    *The Motion to Suppress*

a.      Butts Files a Motion to Suppress

On April 13, 2021, Butts filed a motion seeking to suppress evidence from Myers's visual search of the HTC phone during the interview and the logical download conducted by the LAPD technical investigation division which "found no activity on the device between the dates of April 4th and April 30th."  Butts claimed that she objected to Stearns and Myers entering her mother's Denver Avenue residence, where the interview was conducted, and that Myers blocked her from leaving and confined her to the area around the kitchen table.  She further contended that she was "intimidate[d] and coerce[d] . . . into signing a single-page, pre-filled consent form fraudulently authorizing the seizure of additional electronic devices from another residence."  Butts argued "the court should find that detectives Stearns and

23

Myers 'seized' everything in the house including [Butts]'s person, when they entered the property without a warrant, remained for more than two hours, and limited [Butts]'s freedom of movement."

### b. The Prosecution Opposes the Motion

In its opposition the prosecution submitted a transcript of the audio recording of the April 30 interview discussed above, which it asserted undermined Butts's claim the detectives entered the home without requesting permission and showed Butts allowed Myers to view her phone. The prosecution also asserted that, after the audio recording ended, Butts gave consent for the search of her HTC phone and an additional phone.

### c. The Hearing

The court held a hearing on Butts's motion on April 23, 26 and 29, 2021. Butts's father testified that he had purchased the HTC phone and that it was registered to his account. Butts's father said Stearns and Myers asked both for access and to take the phone, and he refused. On cross-examination, Butts's father conceded that Butts was the phone's primary user. He also testified that Butts told him she had signed a consent to search form. Butts's father further said that, after the phone call with the detectives ended, he drove to the Denver Avenue residence. Once at the house, he saw Butts redact 50 to 60 percent of a document she signed, but he did not look at it or know what the document was. Butts told him at the time it was a receipt for her phone.

Stearns testified that when he and Myers arrived at the Denver Avenue house, Butts invited them inside and she never told them not to enter. Butts signed a consent form authorizing the search of her two phones. Later, Stearns found a third phone

24

and called and obtained Butts's consent to search that phone as well. Butts's father was present when Butts signed the consent form and he told her to sign.

Retired LAPD Captain William Hayes testified he went to the Denver Avenue residence on April 30 and spoke with Stearns, Myers, Butts, and Butts's father. Hayes heard Butts's father tell her to consent to a search of the phone. Hayes authenticated the consent form that Butts signed in his presence, which contained no redactions. Hayes denied that anyone threatened Butts to get her consent and stated, "we did explain to her that we would seize the phone no matter what, and that if she chose not to give consent, that there would still be a search warrant authored to examine the phone. We gave her the choice."

### d. The Trial Court's Ruling

On April 29, 2021, the trial court denied Butts's motion to suppress, finding it was "clear from the recording . . . that [the detectives] calmly asked if they could come in and speak to [Butts], and she voluntarily agreed." Butts was not in custody, and "the detectives did not conduct an unlawful search of [Butts]'s home." The court further found that "there was probable cause to believe that [Butts]'s phone may have contained evidence, that [Butts] may have used her phone to communicate with the male who assaulted the victim immediately before the alleged crime occurred, and that such evidence would or could show [Butts] coordinated a planned assault with the male. As such, there existed probable cause to seize the phone. Even if [Butts] did not consent, or the consent was not valid, their initial search of the phone did not reveal any evidence that is suppressible. The subsequent search of the

25

phone was lawfully conducted pursuant to a lawful search warrant."

        e.        Butts Files a Motion for Reconsideration Which the Trial Court Denies

In June 2021, Butts filed a motion for reconsideration of the trial court's ruling on her motion to suppress. As purported new evidence, Butts submitted a forensic expert's report which concluded "an audio file named '4-30.wav' provided to [him]" was a "manufactured recording" which "likely resulted from editing and/or dubbing audio portions of a 4000 Hz recording into an 8000 Hz recording to create the resulting file."

The trial court held a hearing on the motion on July 19, 2021. Butts argued she had presented new evidence from her forensic expert regarding the audio file and intended to present testimony from a handwriting expert that the search consent form was "a fraudulent document." The court asked Butts, "Why couldn't [her two experts] have been retained before the [motion to suppress] was originally heard?" and Butts responded, "You know, I don't know, your Honor. I don't know." The court denied the motion for reconsideration, finding Butts's purported new evidence "was not obtained with reasonable diligence," and that Butts "should have and could have continued the [motion to suppress] until she obtained these expert opinions regarding the handwriting and the recording so that they could be considered at the original [motion to suppress] hearing and motion. And she did not do that."

        4.    *The Trial Court Did Not Err*

On appeal, Butts does not dispute the court's finding that she consented to the detectives entering the residence. She instead contends the trial court erred because it did not expressly

26

find that she consented to having her phone searched. While the court did not make an express finding to this effect, it made no finding that Butts did *not* consent. Under such circumstances, we presume the court made an implied finding of consent when denying the suppression motion if substantial evidence supports such a finding. (*People v. Redd*, *supra*, 48 Cal.4th at p. 719 [when considering Fourth Amendment issues, appellate courts " 'defer to the trial court's factual findings, express or implied, where supported by substantial evidence' "]; *People v. Benson* (2025) 110 Cal.App.5th 1068, 1081-1082 [" '[I]t is a fundamental principle of appellate procedure that a trial court [order or] judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment' "].) That presumption makes sense here, as the phrasing of the court's ruling indicates that it was making an alternative holding that it would deny the motion "[e]ven if [Butts] did not consent, or the consent was not valid."

Substantial evidence supports the implied finding that Butts consented to Myers looking at her phone during the interview. As is reflected on the audio recording, Myers asked Butts, "would you mind if I took a look?" and she responded, "I would not mind at all." At no point while Myers was looking at the phone did Butts object in any way. There was also ample evidence to support the finding that Butts consented to the limited forensic search of her phone that was performed without a warrant. Stearns and Hayes both testified that Butts signed the consent form in their presence, and the prosecution submitted a signed copy of the consent form. Butts's father testified that Butts told him she had signed a consent form. Hayes denied

27

coercing Butts into signing the form, stating that the officers "gave her the choice" of giving consent or having the phone seized without her consent. Butts did not submit her own declaration or testify that she was coerced into signing the consent form or that she did not sign the form.[8]

Lastly, we reject Butts's conclusory assertion that the trial court erred in failing to grant her motion for reconsideration of the denial of the suppression motion. (See *People v. Gallardo* (2017) 18 Cal.App.5th 51, 69, fn. 11 [appellate court may deem a party's claim waived where they make a "conclusory assertion" unsupported by "legal argument"].)[9]

## B. The Trial Court Did Not Err in Excluding Rios's Statements During the Uber Ride

During trial, the prosecution moved to exclude testimony from Muniz, the Uber driver, about statements he heard Rios and his associate make during the ride. After soliciting briefing, the

---

[8] Butts also contends the trial court erred in finding "[e]ven if [Butts] did not consent, or the consent was not valid, [the detectives'] initial search of the phone did not reveal any evidence that is suppressible" because the absence of evidence can in some cases be relevant. Whether or not the trial court was correct in this conclusion is irrelevant because it did not err in denying the motion to suppress. "On appeal we consider the correctness of the trial court's ruling *itself*, not the correctness of the trial court's *reasons* for reaching its decision." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 145.)

[9] Butts later filed a second motion for reconsideration, which the trial court denied. Butts does not contend that the trial court erred in denying this second motion for reconsideration.

trial court granted the motion.  Butts contends the court erred because the statements were admissible to show Rios's intent or motive in going to Larry's house, and the court abused its discretion under Evidence Code section 352 in concluding those statements would create confusion.

      1.     *Legal Principles and Standard of Review*

" ' "Hearsay evidence" is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.' (Evid. Code, § 1200, subd. (a).)  'Except as provided by law, hearsay evidence is inadmissible.' (*Id.*, subd. (b).)  'We review claims regarding a trial court's ruling on the admissibility of evidence for abuse of discretion.' " (*People v. Henriquez* (2017) 4 Cal.5th 1, 31.)

Evidence Code section 352 provides the trial court with "discretion [to] exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Ibid.*)  This provision " 'permits the trial court "to strike a careful balance between the probative value of the evidence and the danger of prejudice, confusion and undue time consumption." ' " (*People v. Nicolaus* (1991) 54 Cal.3d 551, 578.)  We review the trial court's application of Evidence Code section 352 for abuse of discretion. (*Ibid.*)

"The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review.  The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is

reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712, fns. omitted.) We will imply findings in support of an order where they are supported by substantial evidence. (*People v. Redd*, *supra*, 48 Cal.4th at p. 719; *People v. Benson, supra*, 110 Cal.App.5th at pp. 1081-1082.)

### 2. *Factual Background*

During the first trial, Muniz testified that Rios[10] and his associate said they were meeting up with a woman to have sexual relations, and that Rios showed Muniz a photograph of the woman and asked if he wanted to join them. The two passengers talked about condoms and Muniz heard the word "orgy." Rios stated there was a man at the house of whom he was not fond, he "wanted to possibly assault the guy," the man was attracted to the woman, and if the man "tried anything" then Rios "would beat his ass." Rios's associate stated that the woman they were going to see was rich and they were going to get money from her.

### 3. *The Prosecution's Motion, the Defense's Opposition, and the Trial Court's Ruling*

In moving to exclude this testimony from the retrial, the prosecution argued that Muniz's statements about what Rios said were hearsay and did not fall within the exception for statements by a coconspirator under Evidence Code section 1223. The prosecution also argued the statements were irrelevant and should be excluded under Evidence Code section 352 as they would confuse the issues and create further undue delay.

---

[10] Muniz testified that one of the passengers said he had cancer, and the parties agree this individual was Rios.

30

In opposition the defense argued the coconspirator exception did apply.  The defense also argued that the statements were admissible under Evidence Code section 356 to provide context for text messages which Rios had sent around the same time.  The defense further contended that Rios's statements were admissible under Evidence Code section 1250 to show his state of mind.  Lastly, the defense argued that Rios's statement that Larry was attracted to Butts was admissible to impeach Larry.

The trial court granted the motion, concluding the statements were hearsay and the coconspirator hearsay exception did not apply.  The court also excluded the statements under Evidence Code section 352, stating, "It clearly doesn't assist the jurors in trying to determine whether there's a conspiracy or not. I think it will derail the jurors in starting to hear stories . . . that Ms. Butts is willing to have this orgy . . . ."  The court indicated it had considered Butts's arguments under Evidence Code sections 356 and 1250, and later stated "[t]he other exceptions [apart from the coconspirator exception] do not meet the qualifications either."

4.      *The Trial Court Did Not Err*

On appeal, Butts no longer contends that the coconspirator exception or Evidence Code section 356 applies or that Rios's statements were admissible to impeach Larry, and instead argues that Rios's statements should have been admitted as a statement of his intent or motive in going to Larry's house. Evidence Code section 1250 provides, in relevant part, "Subject to [Evidence Code s]ection 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible

31

by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant." (*Id.*, subd. (a).) Evidence Code section 1252 provides, "Evidence of a statement is inadmissible . . . if the statement was made under circumstances such as to indicate its lack of trustworthiness."

The trial court did not abuse its discretion excluding testimony from Muniz about Rios's statements to him because it could have reasonably concluded the statements were untrustworthy. " 'To be admissible under Evidence Code section 1252, statements must be made in a natural manner, and not under circumstances of suspicion, so that they carry the possibility of trustworthiness. Such declarations are admissible only when they are " 'made at a time when there was no motive to deceive.' " (*People v. Ervine* (2009) 47 Cal.4th 745, 778-779.) Rios had a motive to deceive: he was on his way to help assault Butts's landlord in an Uber arranged by Butts on her account, and had texted with Butts about getting money from her to facilitate the assault. Rios therefore had a reason to fabricate evidence that he was provoked or acted in self-defense, and had a reason to get money from Butts, should he later be fingered for assaulting Larry. Indeed, Butts argued in her trial court opposition that Rios's statements were in furtherance of the conspiracy because they "[could] be considered some type of ruse or advanced explanation for any potential violence against [Larry]."

The trial court also did not abuse its discretion in applying Evidence Code section 352. The court's conclusion that the

balancing required by Evidence Code section 352 tipped in favor of excluding the evidence was within the bounds of reason. Butts contends that Rios's statements would have assisted the jury by offering an alternative reason for Rios going to Larry's house, but the probative value of this evidence was minimal and substantially outweighed by the danger of undue prejudice and confusion of the issues. The probative value was minimal because the evidence was not consistent with evidence of Butts's text exchanges with Rios or with evidence of what actually occurred during the assault, and was not related in any way to Butts's defense, which was not that Rios was coming to Larry's house in the middle of the night to have sex but instead to borrow her car.[11] In contrast, having jurors wonder about whether Butts was going to participate in an orgy created a substantial danger of undue prejudice and confusion of the issues.

---

[11] We also reject Butts's contention the exclusion of Rios's statements violated her due process rights under the state and federal constitutions because "[a] defendant has no constitutional right to present evidence that contains hearsay and is lacking in foundation or other indicia of reliability." (*People v. Williams* (2016) 1 Cal.5th 1166, 1198; see *People v. Snow* (2003) 30 Cal.4th 43, 90 ["Application of the ordinary rules of evidence, such as [Evid. Code, §] 352, generally does not deprive the defendant of the opportunity to present a defense" as constitutionally guaranteed].) Butts fails to explain how the application of the hearsay rule or the trial court's reliance on Evidence Code section 352 denied her a fair trial. Butts's suggestion that Rios's statements "call[ed] into doubt the reliability of the evidence on which the [prosecution relied]" is unfounded, as the statements did not directly relate to any of the evidence the prosecution relied upon.

**C.    The Trial Court Did Not Err in Excluding Evidence of a Post-assault Altercation Butts and her Father Had with Larry's Friends and Family**

Prior to trial, the prosecution moved to exclude evidence of an altercation between Larry's friends and family, Butts, and her father that occurred after the charged assault.  The trial court excluded the evidence under Evidence Code section 352, concluding it would confuse the issues.  Butts contends this was error.

### 1.    *Factual Background*

After Larry was released from the hospital, he went to his house accompanied by several friends and relatives.  When they arrived, Butts and her father were there.  Larry's friends and relatives accused Butts of being involved in the assault, and a melee resulted in which Butts's father was struck.  Butts and her father left and reported the incident to the police.  Butts made an audio recording of the altercation on her phone.

### 2.    *The Prosecution Moves to Exclude Evidence of the Post-assault Altercation and the Trial Court Ultimately Grants the Motion*

Before trial, the prosecution moved in limine to exclude evidence of the altercation.  Butts opposed the motion on the ground that Larry, in trying to stop the altercation, told his family and friends that Butts was not involved in the assault.  The court denied the motion in limine, finding Larry's alleged statements could potentially be relevant.  The court also indicated the prosecution could seek to introduce evidence that when Larry and his entourage arrived at the house they saw Butts cleaning up the gunpowder residue.

The prosecution also moved to exclude evidence of the audio recording of the post-assault altercation under Evidence Code section 352 and based on relevance.  Butts argued that the recording was relevant to show "the volatility of the overall relationships . . . here."  The court initially indicated that the recording might be relevant "depending on what the things were that were said."  The court later said it was inclined to exclude the recording because it appeared irrelevant and would tend to confuse the jurors, but that it would allow the defense to make a showing to justify admitting the evidence.  At the conclusion of the hearing, the court said that if the defense was claiming someone said something relevant during the post-incident altercation, the court would review the audio before making a final ruling.

During trial, Butts sought to introduce evidence of the post-assault altercation, arguing that she needed to explain what she meant when she wrote in a text later that morning that she "just got jumped right now."  Butts also argued the altercation was relevant because Larry told his family and friends that she was not involved in the assault.  The court excluded the proffered evidence.

During Butts's redirect examination, after the prosecution had played the recording of her April 30 police interview, the defense again sought to introduce evidence of the altercation, arguing that "Butts'[s] demeanor on the stand cannot be properly assessed without understanding that a few hours earlier, she was in an altercation."  The court denied the request.

### 3. *The Trial Court Did Not Err*

The trial court's exclusion of evidence of the post-assault altercation under Evidence Code section 352 was not arbitrary or

capricious. It is undisputed that the incident took place several hours after the assault and, as Butts concedes, there was no suggestion that Larry himself was involved in any violence or aggression during the altercation.

Butts argues this evidence was relevant in several respects but does not explain how the probative value of the evidence outweighed the risk of confusing the issues. That alone is fatal to her appellate claim of error. (*People v. Gallardo*, *supra*, 18 Cal.App.5th at p. 69, fn. 11.)[12]

Regardless of this waiver, the probative value of the evidence was minimal. First, Larry's expressed opinion of whether Butts was involved when attempting to de-escalate the altercation had little probative value, because the incriminating evidence of Butts's guilt (such as her text messages with Rios) came from other sources that were unknown to Larry when he made the alleged statement.[13] Second, Butts contends the altercation was relevant to show Larry's "bias" against her, but at most the altercation showed that Larry's family and friends—not Larry—had negative feelings about Butts resulting from the assault. Third, Butts contends the altercation was relevant to

---

[12] To the extent Butts contends the trial court did not base its ruling on Evidence Code section 352, we disagree. It is clear from the court's statements that it excluded the evidence based on the risk it would confuse the issues.

[13] Butts contends evidence of Larry's purported statement during the altercation was relevant to impeach his testimony he accused Butts almost immediately after the intruder(s) left. However, the defense did not seek to impeach Larry in cross-examination, and Butts herself testified that Larry blamed her for the assault immediately after it occurred.

support her claim that Rios complimented her in their text exchange because she had been "jumped" and not because she had Larry assaulted; however, Butts was permitted to explain that her reference to being "jumped" related to a separate incident that occurred after the assault, and further detail was not necessary to explain the reference. Lastly, Butts contends the altercation was relevant to explain her "demeanor" during the interview by Stearns and Myers because "it was clear that the detectives believed she was being manipulative and evasive." Butts cites to Stearns's testimony that he saw Butts manipulating her phone and was concerned she had deleted data. We fail to see any meaningful connection between the altercation and Butts manipulating her phone during the later interview with Stearns and Myers, and Butts does not elucidate one.

In light of this minimal probative value, the trial court did not err in finding the substantial confusion that evidence of the altercation would generate outweighed the minimal probative value of the proffered evidence.[14]

---

[14] Butts also argues that the exclusion of evidence of the altercation violated her constitutional rights because it was "critical to the prosecution's case against [her]." As we have explained, evidence of the altercation had minimal, if any, probative value, and it was not critical to the prosecution's case or to Butts's defense. Butts fails to identify any other aspect of the ruling which implicates her constitutional rights. (*People v. Snow, supra*, 30 Cal.4th at p. 90 [application of Evid. Code, § 352 generally does not implicate a defendant's constitutional right to present a defense].)

**D.** **The Trial Court Did Not Prejudicially Err in Permitting Cross-examination About Butts's Expulsion from Law School**

Over the defense's objection, the trial court allowed the prosecution to ask Butts during cross-examination whether she had been expelled from a law school for being hostile to others and for lying and manufacturing evidence in attempting to explain why she was late to an exam. After Butts denied those reasons led to her expulsion, the court permitted the prosecution to introduce a letter from the law school to Butts notifying her of the expulsion and the reasons for it. Butts contends the trial court prejudicially erred in allowing this evidence, and in precluding her from introducing evidence to rebut the law school's conclusions.

1. *Legal Principles and Standard of Review*

The prosecution used this evidence partly to rebut character evidence Butts had adduced and partly to impeach her credibility as a witness. Thus, we set forth the applicable law regarding these two uses.

a. Rebutting Character Evidence Adduced by a Criminal Defendant

Under Evidence Code section 1102, in criminal cases "evidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation is" generally admissible where it is: "(a) Offered by the defendant to prove his conduct in conformity with such character or trait of character[; ¶ or] (b) Offered by the prosecution to rebut evidence adduced by the defendant under subdivision (a)." (*Ibid.*) "[W]hen a defendant offers evidence of his good character 'to prove his conduct in conformity with such character or trait of character,'

38

the prosecution may offer evidence to rebut it." (*People v. Hall* (2018) 23 Cal.App.5th 576, 591, quoting Evid. Code, § 1102, subd. (a).) However, " ' "the scope of rebuttal must be specific, and evidence presented or argued as rebuttal must relate directly to a particular incident or character trait [the] defendant offers in his own behalf." ' " (*Hall, supra*, at p. 591.)

### b. Evidence of a Witness's Credibility

Under Evidence Code section 780, the jury "may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including" the witness's "character for honesty or veracity or their opposites." (*Id.*, subd. (e).) "A witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under Evidence Code section 352." (*People v. Clark* (2011) 52 Cal.4th 856, 931.) "Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court ordinarily will uphold the trial court's exercise of discretion." (*Id.* at p. 932.)

### 2. *Background*

During direct examination Butts testified to her character for peacefulness, namely that "[she] would never be upset enough to harm anyone."

Before cross-examining Butts, the prosecutor requested permission to impeach her with the fact that Pacific Coast University, School of Law had expelled her. Business records subpoenaed from the school included a July 27, 2014 letter from the school informing Butts that she was being expelled and

listing the reasons for it. The prosecutor argued that two of the school's five grounds for the expulsion—that "Butts ha[d] been hostile toward teachers, staff administration and other students creating a hostile and offensive learning environment" and "was deceitful as to why she was late to a final examination and falsely manufactured an envelope so as appear official"—could be used as impeachment regarding her testimony that "[she] would never be upset enough to harm anyone" and Butts's veracity as a witness.

The defense argued the evidence was stale, as Butts was expelled in 2014. The defense also objected that the school's findings were hearsay, and asserted that Butts contested the school's action and would seek to introduce evidence that it was unfounded. The prosecutor responded that the expulsion letter fell within the business records hearsay exception.

The court ruled that the prosecutor could ask Butts whether she had been expelled from the law school for the two reasons. If Butts answered "yes," then the matter was concluded; if Butts did not respond "yes," then the prosecutor could introduce the expulsion letter.

On cross-examination, the prosecutor asked Butts if she was expelled from Pacific Coast University, School of Law for the two reasons. Butts responded she "was expelled, but not for the reason[s] [the prosecutor] stated." The court then permitted the prosecutor to introduce the school's expulsion letter over the defense's objection.

On redirect, defense counsel asked whether Butts had contested the two reasons for her expulsion, and she responded, "I don't know." The trial court sustained objections to defense counsel's questions about whether Butts had hired a lawyer to

"correct" some of the records regarding her expulsion, whether Butts had "go[ne] through any sort of hearing," and whether Butts agreed with the reasons for her expulsion.

3. *Analysis*

a. The Accusation of Hostile Behavior

Butts placed at issue her character for peacefulness when she testified that "[she] would never be upset enough to harm anyone." This permitted the prosecution, under Evidence Code section 1102, subdivision (b), to adduce contrary evidence. That included evidence that Butts had personally engaged in other violence, including an incident in which she bit a police officer, that Butts does not challenge on appeal. It also included evidence that Butts had been expelled from law school in part for hostile behavior towards others. The law school's letter was evidence "in the form of an opinion" "[o]ffered by the prosecution to rebut evidence adduced by" Butts to show her character for peacefulness, which she had already "[o]ffered . . . to prove [her] conduct in conformity with such . . . trait of character." (Evid. Code, § 1102.)

Butts argues evidence of her hostility had no probative value to her character for peacefulness. She claims that because the law school provided no details as how Butts had been hostile, it could have been "verbal" hostility. Even if this is true, the school's accusation was relevant to undermine Butts's claim at trial, which was not merely that she was not inclined to harm people, but that she would never become "upset enough to harm anyone." The school's accusation that Butts had become upset enough to create a "hostile" environment harmful to others was therefore relevant to impeach her own claim about her character. (See *People v. Hawara* (2021) 61 Cal.App.5th 704, 713 ["Once a

41

witness testifies, on direct examination, to the defendant's good character, it is a common and accepted method of cross-examination to ask whether the witness is aware of instances of the defendant's bad character"].)

Butts further argues the trial court erred in admitting the expulsion letter over her hearsay objection. We are not persuaded as concerns the school's statement regarding Butts's hostility towards others. The court did not abuse its discretion in finding the business records hearsay exception (Evid. Code, § 1271) applied. Under this exception, the letter was admissible to prove that the law school was of the opinion that Butts had engaged in sufficiently hostile conduct to justify expelling her.

> b.     The Accusation of Lying and Fabricating Evidence

Evidence that Butts had lied about being late to a law school exam and fabricated evidence in support of that excuse was relevant to show she lacked credibility as a witness. Thus, the trial court did not err in permitting the prosecution to ask Butts whether she had been expelled for lying and fabricating evidence because the prosecutor had a good faith belief Butts had done so based on the expulsion letter. (See *People v. Steele* (2000) 83 Cal.App.4th 212, 223 [party can only ask a witness about misconduct relevant to credibility if they have a good faith belief that the witness engaged in such misconduct].)

Butts did not admit that she had been expelled for lying and/or fabricating evidence, so the trial court permitted the prosecution to introduce the expulsion letter to impeach her denial and credibility as a witness. Butts contends this was error, and we agree. To the extent the letter was relevant, it was to prove that Butts had previously lied and falsified evidence.

And as to that ground, the letter was inadmissible hearsay. (*People v. Wheeler* (1992) 4 Cal.4th 284, 300-301, fn. 15 (*Wheeler*).)

In *Wheeler*, which involved the use of a misdemeanor conviction to impeach the credibility of a defense witness, the Supreme Court rejected the People's argument that "the *fact of conviction alone*" was relevant to credibility, concluding that the evidence must show prior conduct involving moral turpitude. (*Wheeler*, *supra*, 4 Cal.4th at p. 299.) Thus, "even if [the defendant]'s testimony was competent to establish the fact of conviction, the conviction itself was inadmissible hearsay evidence of underlying criminal conduct relevant to impeachment. We therefore conclude that evidence of a misdemeanor *conviction*, whether documentary or testimonial, is inadmissible hearsay when offered to impeach a witness's credibility."[15] (*Id.* at p. 300, fn. omitted; see *People v. Steele*, *supra*, 83 Cal.App.4th at p. 223 [in a criminal case, "where a witness denies having committed a misdemeanor consisting of moral turpitude, he or she may only be impeached by evidence of the underlying conduct of that misdemeanor"].)

Although the expulsion letter was not a misdemeanor conviction, the principle of *Wheeler* still applies because, like such a conviction, the letter summarized a conclusion regarding an act

---

[15] This analysis is inapplicable to felony convictions because Evidence Code section 788 creates an exception to the hearsay rule for felony convictions. (*Wheeler*, *supra*, 4 Cal.4th at p. 298.)

of moral turpitude and was not a prior felony conviction.[16] Accordingly, the prosecution could not rely on the expulsion letter to show that Butts had previously lied and fabricated evidence because it was hearsay as to that issue.  Under the business records hearsay exception (Evid. Code, § 1271) the letter was admissible to show that the law school had expelled Butts based on *its* conclusion she had lied and fabricated evidence, but that is not sufficient to establish that Butts had in fact lied and fabricated evidence.  (*Wheeler, supra,* 4 Cal.4th at p. 299; *People v. Steele, supra*, 83 Cal.App.4th at p. 223.)  Accordingly, the trial court erred in overruling Butts's hearsay objection to the expulsion letter as to the portion of the letter stating Butts had lied and fabricated evidence.

### c.     Remaining Arguments

Butts also argues the trial court should have excluded evidence of her law school expulsion in its entirety as unduly prejudicial and because the expulsion was too remote in time (roughly nine years before the trial).  We disagree.  Butts herself

---

[16] The *Wheeler* court quoted and adopted the following analysis by the California Law Revision Commission: " '[a]nalytically, a judgment that is offered to prove the matters determined by the judgment is hearsay evidence.  [Citations.]  It is in substance a statement of the court that determined the previous action [i.e., other than by a testifying witness] . . . that is offered "to prove the truth of the matter stated."  [Citation.]  Therefore, unless an exception to the hearsay rule is provided, a judgment would be inadmissible if offered in a subsequent action to prove the matters determined.'  (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1966 ed.) § 1300, pp. 342-343.)" (*Wheeler, supra*, 4 Cal.4th at p. 298.)  This reasoning applies with equal force to the expulsion letter.

put in issue her character, and prior acts of moral turpitude were relevant to the jury evaluating the credibility of her testimony seeking to explain her texts and other actions. Nor are we persuaded that the trial abused its "broad" discretion in overruling her Evidence Code section 352 objection that the evidence was stale. (*People v. Clark, supra*, 52 Cal.4th at p. 931; see also *People v. DeCosse* (1986) 183 Cal.App.3d 404, 412 ["any contention that [a 12-year-old conviction] was necessarily remote and therefore inadmissible must . . . be rejected"].)[17]

Lastly, we reject Butts's contention that the trial court erred in sustaining objections to questions her counsel asked her in redirect. The court permitted defense counsel to ask Butts whether she had contested the two reasons for her expulsion (to which she responded, "I don't know") but sustained objections to questions whether Butts had hired a lawyer to "correct" some of the records regarding her expulsion and whether she had "go[ne] through any sort of hearing there." The trial court did not abuse its discretion in concluding these additional questions sought irrelevant information. The trial court also sustained an objection to defense counsel's question whether Butts agreed with the law school's "conclusions." Given Butts's lack of recollection about any contemporaneous challenge to the grounds for her expulsion, the court did not abuse its discretion in concluding testimony about Butts's subjective feelings concerning the

---

[17] Butts points out that the court measured remoteness from the time of the assault, and not the time of the testimony, but the court was responding to defense counsel's argument that referred to the time of the assault.

grounds for her expulsion would result in "undue consumption of time" under Evidence Code section 352.

       4.    *The Error Was Harmless*

The error by the trial court admitting the expulsion letter for the truth of its assertions that Butts had in fact lied and fabricated evidence was harmless. We "cannot reverse a judgment based on the erroneous admission of evidence unless the admitted evidence 'resulted in a miscarriage of justice.' (Evid. Code, § 353, subd. (b).) In a criminal case, a miscarriage of justice can only be found when the reviewing court determines it is reasonably probable that a result more favorable to the defendant would have been reached had the trial court excluded the erroneously admitted evidence." (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 170, fn. omitted; see also *People v. Collins* (1986) 42 Cal.3d 378, 391 [the improper admission of evidence impeaching a criminal defendant's veracity is harmless where the defendant has testified and "it is reasonably probable that a result more favorable to the defendant would *not* have been reached in the absence [of the evidence]"].)[18]

No miscarriage of justice occurred here, and it is not reasonably probable Butts would have achieved a more favorable result had the letter not been admitted for the truth of the law school's conclusion Butts had lied and fabricated evidence. The evidence of Butts's guilt was overwhelming and was based

---

[18] We reject Butts's claim that the introduction of evidence regarding her law school expulsion implicated her constitutional rights and that therefore any error must be harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.E.2d 705].

46

primarily on Butts's text exchanges with Rios, including their communications in the minutes leading up to the assault. Butts did not deny that she participated in the text exchanges, her alternate explanations about those texts were not credible, and she failed to even address the most incriminating texts. Furthermore, evidence regarding the reasons why Butts was expelled from law school was not significantly prejudicial. The jury heard other evidence that Butts had been deceitful, such as audio recordings of her statements to police in which she gave materially different accounts of key events and repeatedly lied about Rios's true name.

## E.  The Trial Court Did Not Err in Ruling on Butts's *Pitchess*[19] Motion

In July 2017, Butts filed a *Pitchess* motion for discovery of personnel records of detectives Stearns and Myers related to prior wrongful acts, "[d]ishonesty/untruthfulness," or "[m]ishandling of evidence." The trial court granted the motion limited to potential evidence of false police reports by Stearns or Myers. The court reviewed the detectives' personnel records in camera and found no discoverable information.

Butts does not challenge the trial court's ruling as to the scope of discoverable material. Butts does, however, request that we independently review the transcript of the in camera proceeding and the personnel files provided to the trial court. The People do not oppose Butts's request. We review the trial court's ruling on a *Pitchess* motion for abuse of discretion. (*People v. Samayoa* (1997) 15 Cal.4th 795, 827.)

---

[19] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

Having reviewed the transcript of the in camera proceeding, we find no error in the trial court's determination that the detectives' personnel records contained no discoverable information.[20]

## F.     The Trial Court Did Not Err in Failing to Sua Sponte Instruct the Jury on Simple Assault

Butts's defense at trial was to deny any involvement in the assault and not to quibble with the amount of force used during it.  Butts nevertheless contends the trial court erred in failing to sua sponte instruct the jury on simple assault as a lesser included offense.  The jury convicted Butts of assault "by . . . means of force likely to produce great bodily injury."  (§ 245, subd. (a)(4).)  In contrast, under section 240, a simple assault is "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."  Butts argues there was

---

[20] The record does not include the detectives' personnel records reviewed by the trial court.  Butts filed a motion to augment the record with the personnel records, along with the transcript of the in camera proceedings.  We granted the request, and the superior court augmented the record with the transcript.  However, the superior court could not locate the personnel records, presumably because the trial court did not retain those records or have copies made.  Although Butts received notice that the superior court did not have the personnel records, she undertook no further efforts to obtain the documents.  In any event, our review of the transcript is sufficient, as it describes the records provided to the trial court.  (See *People v. Myles* (2012) 53 Cal.4th 1181, 1209 ["The sealed transcript that is before us, in which the court 'state[d] for the record what documents it examined,' is adequate for purposes of conducting a meaningful appellate review"].)

substantial evidence that the amount of force used in the assault was not likely to cause great bodily injury such that a simple assault instruction was required.

"[A] trial court must instruct the jury on a lesser included offense, whether or not the defendant so requests, whenever evidence that the defendant is guilty of only the lesser offense is substantial enough to merit consideration by the jury." (*People v. Choyce* (2025) 18 Cal.5th 86, 104.) " ' "To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist." ' " (*People v. Thomas* (2023) 14 Cal.5th 327, 385.) " 'Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense.' " (*Ibid*.) "We independently review a trial court's failure to instruct on a lesser included offense and view the evidence in the light favorable to the defendant." (*People v. Aguilar* (2019) 41 Cal.App.5th 1023, 1027.)

For purposes of section 245, "[g]reat bodily injury is bodily injury which is significant or substantial, not insignificant, trivial or moderate." (*People v. McDaniel* (2008) 159 Cal.App.4th 736, 748.) Here, Larry testified the attacker hit him in the head with something hard, causing him to bleed from the head. Larry was struck two more times in his arm, which he had raised to block the strikes. Larry was hit hard enough to suffer a concussion and required six stitches to close a laceration on his forehead. When she was interviewed by police at the hospital, Butts stated she saw the attacker strike Larry with a three-foot long metallic object. At trial, she testified the attacker struck Larry in the head with the butt of a gun.

In light of all this, the trial court did not err in failing to sua sponte instruct the jury on simple assault. Blows to the head with a hard object with force sufficient to break the skin and cause bleeding constitute force likely to cause great bodily injury, and there was no evidence of lesser injury. Butts argues, "Granted, the blow to [the] head did end up causing Larry great bodily injury given that he suffered bleeding and concussive symptoms. But the jury did not have to accept this." The point of this argument is unclear. There was no dispute at trial that Larry was struck in the head with a hard object with substantial force. Apparently contradicting her concession that Larry actually suffered great bodily injury, Butts goes on to minimize his injuries as not "life threatening." This argument fails because "[s]ection 245 'prohibits an assault by means of force *likely* to produce great bodily injury, not the use of force which does in fact produce such injury." (*People v. McDaniel*, *supra*, 159 Cal.App.4th at p. 748.)

Lastly, Butts argues that the evidence shows the attacker did not fire the gun at Larry. While the evidence was equivocal as to whether the attacker intended to shoot Larry, Butts was not charged with assault with a firearm (§ 245, subd. (a)(2)) and, as we have explained, striking a person's head with a hard object with sufficient force to break the skin constitutes force likely to cause great bodily injury.

## G.    There Was No Cumulative Error Requiring Reversal

Butts argues that, when considered cumulatively, the trial court's errors denied her a fair trial. We have concluded the trial court only erred in one ruling, namely, the admission of the portion of the letter indicating Butts had been expelled from law

50

school due to lying and fabricating evidence.  As noted, this error was harmless.  There are no other errors to cumulate.

## H.  Butts Has Waived Her Claim to Relitigate the Court's Denial of Her Request for Mental Health Diversion

Butts asks us to conditionally reverse her conviction and remand with directions for the trial court to consider whether she is entitled to mental health diversion under section 1001.36. Butts unsuccessfully moved for mental health diversion several times during the case.  The last time was in August 2022; the trial court denied that motion in September 2022.  Butts concedes that the trial court's denial was correct under the version of section 1001.36 then in effect but contends the trial court "effectively erred and abused its discretion" because section 1001.36 was later amended.  Those amendments, however, occurred months before Butts's trial began and she had ample time to argue to the trial court that they applied to her.  She never did and therefore has waived her claim.

### 1.  *Section 1001.36*

"The Legislature in June 2018 enacted section 1001.36, creating a pretrial diversion program for certain persons with mental health disorders."  (*People v. Doron* (2023) 95 Cal.App.5th 1, 7.)  "As originally enacted, section 1001.36 provided that a trial court may grant pretrial diversion if it finds all of the following: (1) the defendant suffers from a qualifying mental disorder; (2) the disorder played a significant role in the commission of the charged offense; (3) the defendant's symptoms will respond to mental health treatment; (4) the defendant consents to diversion and waives his or her speedy trial right; (5) the defendant agrees to comply with treatment; and (6) the defendant will not pose an

51

unreasonable risk of danger to public safety if treated in the community." (*People v. Frahs* (2020) 9 Cal.5th 618, 626-627.)

The Legislature has amended section 1001.36 several times since its enactment. At issue here are amendments that created a rebuttable presumption in favor of defendants relating to the connection between the defendant's disorder and the charged offense. In September 2022, when the trial court denied Butts's last diversion motion, the statute provided:

"A court may conclude that a defendant's mental disorder was a significant factor in the commission of the charged offense if, after reviewing any relevant and credible evidence, including, but not limited to, police reports, preliminary hearing transcripts, witness statements, statements by the defendant's mental health treatment provider, medical records, records or reports by qualified medical experts, or evidence that the defendant displayed symptoms consistent with the relevant mental disorder at or near the time of the offense, the court concludes that the defendant's mental disorder substantially contributed to the defendant's involvement in the commission of the offense." (Former § 1001.36, subd. (b)(1)(B); Stats. 2022, ch 47, § 38.)

Later, effective January 1, 2023, this provision was amended as follows:

"If the defendant has been diagnosed with a mental disorder, the court shall find that the defendant's mental disorder was a significant factor in the commission of the offense unless there is clear and convincing evidence that it was not a motivating factor, causal factor, or contributing factor to the defendant's involvement in the alleged offense. A court may consider any relevant and credible evidence, including, but not limited to, police reports, preliminary hearing transcripts,

witness statements, statements by the defendant's mental health treatment provider, medical records, records or reports by qualified medical experts, or evidence that the defendant displayed symptoms consistent with the relevant mental disorder at or near the time of the offense." (Former § 1001.36, subd. (b)(2); Stats. 2022, ch. 735, § 1.)

"Under the amended statute . . . a defendant is generally eligible for diversion if the defendant 'has been diagnosed' with a recognized mental disorder. [Citations.] Beyond that, the amended statute creates a presumption that the defendant's diagnosed mental disorder was a significant factor in the commission of the charged crime, 'unless there is clear and convincing evidence that [the mental disorder] was not a motivating factor, causal factor, or contributing factor to the defendant's involvement in the alleged offense.' " (*People v. Brown* (2024) 101 Cal.App.5th 113, 120.)

### 2. *Background*

As previously noted, Butts filed the last in a series of motions for mental health diversion on August 16, 2022. The motion was based on a report from a clinical and forensic psychologist, Nadim N. Karim, Ph.D., who diagnosed Butts with generalized anxiety disorder, persistent depressive disorder, post-traumatic stress disorder (PTSD), and substance abuse disorder. Dr. Karim opined that Butts's disorders significantly contributed to the commission of the crimes. Dr. Karim further opined that Butts's symptoms could be successfully treated through outpatient mental health treatment, including individual therapy for depression, anxiety and PTSD, substance use counseling, "and a referral to a psychiatrist for a medication review."

53

To respond to Butts's motion, the prosecution sought an evaluation of Butts by its expert. On September 2, 2022, the court appointed Jody Ward, Ph.D. to complete a mental health evaluation of Butts for purposes of determining her eligibility under section 1001.36.

Butts failed to appear for her appointment to be evaluated by Dr. Ward. The court accordingly denied the diversion request, concluding that Butts had failed to show she was eligible for mental health diversion by failing to show her disorders were a substantial factor in the assault and that there was a plan for treatment of her disorders.

3.     *Analysis*

Butts has waived her appellate claim that statutory amendments made after the court denied her last motion for mental health diversion made her eligible for such diversion, because she failed to make that argument in the trial court. The new law became effective in January 2023. Butts's trial did not start until July 2023, so she had ample time to present this argument to the trial court. She never did. Although we do not know the exact reason for this, her prior refusal to participate in an evaluation by anyone other than her handpicked expert would appear to indicate such a motion would have failed regardless of the change in law. " ' "No procedural principle is more familiar to this Court than that a constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." ' " (*People v. Saunders* (1993) 5 Cal.4th 580, 590.) " ' " 'The purpose of the general doctrine of waiver is to encourage a defendant to bring errors to the attention of the trial court, so that they may be corrected or

avoided and a fair trial had . . . .' " ' " (*People v. Simon* (2001) 25 Cal.4th 1082, 1103.)

Butts relies on *People v. Brown*, *supra*, 101 Cal.App.5th 113, where the Court of Appeal rejected forfeiture in a mental health diversion matter. (*Id.* at p. 128.) We find the situation in *Brown* distinguishable. Given the "narrow circumstances" presented in that case, where the defendant was sentenced only 10 days after the amendments to section 1001.36 became effective, the Court of Appeal reasonably excused the defendant's failure to seek relief based on the amendments in the trial court. (*Brown*, *supra*, at pp. 116-117.) By the time the amendments took effect, the defendant in *Brown* was precluded from seeking mental health diversion in the trial court because he had already been convicted. (*Id.* at p. 126; see also *People v. Braden* (2023) 14 Cal.5th 791, 824-825 [concluding "the Legislature intended to require that a defendant request pretrial mental health diversion before jeopardy attaches at trial or before the entry of a plea of guilty or no contest, whichever occurs first"].) Thus, the *Brown* court concluded, "we cannot fault [the defendant]'s trial counsel for failing to seek reconsideration based on a recent amendment that had become effective only 10 days earlier, and that no court had yet found to be retroactive, particularly in light of *Braden*'s focus on the general requirement that such motions be brought prior to trial." (*Brown*, *supra*, at p. 128.)

In stark contrast, Butts had six months after the amendments to section 1001.36 became effective to seek relief in the trial court before her trial began. Under these circumstances, she waived her claim to mental health diversion under the amended statute.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED

                              WEINGART, J.


We concur:



ROTHSCHILD, P. J.



M. KIM, J.